UNITED STATES of America, Plaintiff,

v.

**Jesse MANETI, Defendant.**

**No. Cr. 90–67L.**

United States District Court,
W.D. New York.

Dec. 18, 1991.

Christopher Buscaglia, Asst. U.S. Atty., Rochester, N.Y., for plaintiff.

John Parrinello, Rochester, N.Y., for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

Defendant has filed various motions seeking discovery, a bill of particulars and suppression of physical evidence and oral statements. The Court held argument on all motions and conducted an extensive suppression hearing.

This constitutes the Court's decision concerning the several pretrial motions filed by defendant.

### I. DEFENDANT'S MOTION TO SUPPRESS.

Defendant moves to suppress physical evidence seized pursuant to a search warrant of his home at 3457 Latta Road, Greece, New York ("the premises") on February 15, 1990. Defendant does not challenge the execution of the search warrant. Rather, he maintains that the warrant was defective on its face because the description of the premises failed to describe the premises as a two-family dwelling.

Defendant also moves to suppress certain oral statements that he made to law enforcement officers during the execution of the search warrant. Defendant maintains that these statements were the fruits of the illegal entry and that the statements must be suppressed. In addition, defendant claims that he made these statements during interrogation by the police and that he never received any *Miranda* warnings. Therefore, defendant maintains that the statements must be suppressed under the Fifth Amendment.

### A. *Facts.*

The Court conducted an extensive suppression hearing concerning the circumstances surrounding the application for the search warrant and its execution. Under *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the hearing focused on the nature of the police investigation as to the type and description of the building to be searched.

In a nutshell, the officers who applied for the warrant believed from their observations of the premises that it was a single family residential home. The application for the warrant sworn to by Alcohol, Tobacco and Firearms (ATF) Agent Nancy J. Roward, described the premises as "3457 Latta Road, Greece, New York (2 story white wood colonial, 1 car attached garage, 2 car detached garage in rear. 3457 on mailbox in front of house)."

Defendant maintains that the warrant is defective because the premises at 3457 Latta Road was, and has been for many years, a two-family dwelling and that the defendant maintained the front apartment on the premises. Defendant's mother resided in a separate apartment in the rear. Defendant claims that the officers upon reasonable inspection and investigation should have known that the dwelling was a two-family unit and should have obtained a warrant only for his apartment.

Several law enforcement agencies including the Federal Bureau of Investigation (FBI), Rochester Police Department (RPD), and the Alcohol, Tobacco and Firearms Division of the Treasury Department had conducted an investigation concerning the manufacture and sale of firearm silencers in January and February 1990. On February 15, 1990, several targets of the investigation were arrested in Rochester, New York. These defendants included Leonard Stebbins, Michael Shea and Marvin Shacket. Messrs. Shea and Stebbins were arrested at approximately 2:00 p.m. and Shacket was in custody at least by 4:00 p.m. Shacket was taken to the FBI Office in downtown Rochester where he confessed to the manufacture and distribution of silencers and agreed to cooperate with the FBI. Special Agent Christopher Cuyler of ATF estimated that the interrogation of Shacket commenced between 4:30 and 5:00 p.m. on February 15.

During the debriefing of Shacket, he told the officers that he had sold ten silencers to a "Jesse Maneti" who lived on Latta Road in Greece, New York. Shacket was unable to provide the precise spelling of Maneti's last name and although he had a telephone number for Maneti, he did not know Maneti's precise address on Latta Road.

Through the use of a city directory, telephone books, a check with the Department of Motor Vehicles and Shacket's address book, the police determined that a Jesse Maneti lived at 3457 Latta Road and a decision was made to obtain a search warrant as soon as possible for that address.

The agents verified the address on Latta Road by using the Polk City Directory. Agent Roward testified that another agent had the book open to page 484 (Ex. 5A) where the name "Jesse Maneti" at 3457 Latta Road was listed. Roward testified that she only noticed the name Jesse Maneti at that address. She testified that she did not notice, prior to obtaining the warrant, that there were two other Maneti's listed at the same address, Mrs. Mary Maneti and Tyrone F. Maneti.

Shacket, Shea and Stebbins were all presented to the United States Magistrate that afternoon and had all been released from custody before the agents were able to obtain a search warrant from the same Magistrate. Several officers testified at the hearing that they were concerned that one or more of the individuals who had been arrested might notify Maneti and warn him of the arrests and the police investigation. The officers were anxious to obtain the warrant as soon as possible.

A decision was made to send several agents to the premises for two purposes: to obtain a description of the premises for the search warrant and to maintain surveillance of the property to monitor the activities there. It was determined that agents of ATF would perform these functions and Cuyler, a supervisor, directed several agents in two cars to report to 3457 Latta Road.

Scott Samis, an ATF agent, testified that he received the duty assignment to go to Latta Road at about 6:30 p.m. on February 15. He understood that his assignment was to get a description of the residence for the search warrant and he was to maintain surveillance of the property. Samis left the Federal Building with two other ATF agents, Thomas Clark, a 22 year veteran with ATF and Agent William Cook.

Another car containing two other agents provided backup.

Samis testified that it had been snowing all day and that the roads were slippery and icy. Visibility was very poor. He described visibility as being only fifty to sixty feet as they drove toward the premises in Greece.

Neither Samis nor any of the agents who had accompanied him had ever heard of Maneti prior to that day and none of them had ever been to the premises. In fact, the agents were not from Rochester and they were not familiar with the area around Latta Road. The officers drove slowly down Latta Road until they found the mailbox with the numbers 3457. The agents drove past the house, turned around, came back and parked directly in front of the house. Samis estimated that he was approximately forty to fifty feet from the front of the house from his vantage point in the police car. Samis made all his observations of the house from the car. He was about ten feet from the roadside mailbox and he observed only one address on the box and the pole held only one mailbox and one plastic newspaper container.

He described the house as a two-story white colonial structure. He only observed one front entrance. There were conifer trees and bushes in front of the house which obscured much of his view. He could not see the west side of the building at all. The driveway was located on the east side and as he drove away from the premises he noticed that there was a two car detached garage in the rear. He described the house as "dark" and did not observe any lights either inside or outside the house. He said that visibility was poor and that it continued to snow when he made his observations of the house. He estimated that his observations of the house took about ten seconds. He did not recall making any particular observations about other houses in the immediate area. Because of the blowing and drifting snow, he could not determine if there was a sidewalk to the front door.

Samis then radioed his description of the premises to officers at the Federal Building

who were preparing the warrant for submission to the Magistrate. Samis estimated that this call was made between 7:15 and 7:30 p.m.

Samis testified that after he made his report, he then returned to the premises and set up surveillance across the street. He was at his post for almost two hours and during that time he made no observations that changed his opinion that this was a single family home.

Samis was a new agent and had entered on duty approximately eight months prior to execution of this warrant. He indicated that he had received training concerning search warrants and, although he had not prepared any warrants himself since becoming an agent, he had obtained descriptions of property for four other warrants.

Samis admitted that he received no specific instructions or directions from any of his superiors on the night in question as to what he should do to obtain a description of the premises. He knew it was important to be precise and he knew that it was important to distinguish between a single and a multiple family dwelling. Samis testified that he did not see any doors on the east side of the house during his initial observation. He discovered these doors later when he executed the warrant. Samis testified that the two other agents in the car concurred with the description that he transmitted over the radio to agents at the Federal Building.

ATF Agent Thomas A. Clark testified that he was brought in from Syracuse, New York, to assist in the arrests and search on February 15, 1990. Clark recalled hearing Agent Samis advise other agents in the Federal Building that the residence was a single family dwelling. He concurred with Samis that from their surveillance position, the house did appear to be a single family dwelling. Clark also recalled that the weather was very poor and that it was dark and raining during their surveillance.

Cuyler, an agent for nineteen years, testified that his agents were assigned to obtain a description of the premises. He assigned Agent Clark, a twenty-two year veteran and Samis who he knew to be a new agent. Cuyler was present when Samis telephoned in the description and he recalls hearing Samis describe the premises as a single family dwelling. In fact, Cuyler claimed that he questioned Assistant United States Attorney Anthony Bruce because Bruce did not make that notation on the warrant application. Cuyler went back on the radio and asked Samis to confirm that it was a single family unit.

Cuyler and Special Agent Nancy Roward were part of the team chosen to execute the warrant. There were approximately nine officers who executed the warrant. Four or five were stationed outside the premises and Cuyler, Roward and two others went to the door to enter the premises. As Cuyler went up the driveway and approached the side of the house, he noticed two doors there. When he first made this observation, he did not believe the door toward the front was an entrance to the premises but rather the entrance to some type of storage facility. The officers knocked on the rear of the two doors, announced that they were police officers and asked for Jesse Maneti. An older woman, who later turned out to be Maneti's mother, gestured to the other door toward the front of the building and directed the officers there. The officers went to that door and entered a small covered vestibule. They knocked on the inner door and were met by Maneti and his wife.

At this point, the officers entered the premises and advised Maneti of their purpose. Cuyler told Maneti that they were searching for silencers and that Maneti could help them find the silencers or the agents were prepared to stay there as long as it took to find them. Cuyler admitted that at no time did he advise Maneti of his so-called *Miranda* rights since Maneti was not arrested or taken into custody on that day. Maneti advised the agents that the silencers were in the basement and he took them there and pointed to a stove where the silencers were located.

Maneti repeatedly asked the agents if he was going to be arrested and they assured him that he would not be arrested that

evening. Cuyler said that he received instructions from Assistant United States Attorney Bruce not to arrest Maneti unless there were difficulties at the premises.

During the ensuing conversation with Agent Cuyler, Maneti made several incriminating statements. Some of these statements occurred when the agents found weapons and other material in the house. Maneti would be asked about the items and he freely discussed his activities concerning those items.

The defense submitted proof from several different sources that 3457 Latta Road was a two-family dwelling on February 15, 1990. Defendant's mother, Mary Minnitti,[1] testified that she had occupied the rear apartment at the premises for 14 years. Her apartment was completely separate from the front apartment which was occupied by her son and his family. She testified that there was no common access from her apartment to her son's except that there was a door in the basement between her part of the basement and her son's part.

Mrs. Minnitti also corroborated the agent's testimony that they came to her apartment first and she directed them to her son's apartment in the front of the house.

It is clear from both Mrs. Minnitti's testimony and agents that no entry into or search of her apartment was made on the date in question.

Mrs. Minnitti also corroborated the agent's testimony concerning the weather that evening. She recalled that it was raining heavily when the agents arrived.

Representatives from the local telephone company (Rochester Telephone Company) and the local utility company (Rochester Gas and Electric) testified that separate telephone, gas and electric service was provided to the two apartments at 3457 Latta Road. Both representatives indicated that this separate service had been provided for many years. The Rochester Gas and Electric records showed separate service for the "front" and "rear" of 3457 Latta Road. The Rochester Telephone Company records show that one phone was listed in the name of Mary Minnitti and another in the name of Jesse Maneti. Both representatives testified that subscriber information was always available to designated police agencies.

There was testimony submitted by both the Government and the defense concerning town records that described the permissible use for the premises. One town planner, Michael Bonanza, testified for the Government that after he reviewed the record, it was his opinion that the premises in question was zoned "single family residential" and that was the only permissible use. He conceded that building department records showed that there was an application for a variance as a two family unit in 1969, but this was conditioned on installation of a proper septic system. In his opinion, because the records did not satisfy him that such a system had been installed and approved, Bonanza concluded that the premises still could only be used as a single family residence.

The defense presented contrary testimony from another town official, Deputy Building Inspector Paul J. Czapranski. Czapranski examined some of the same records and it was his opinion that the property was properly maintained as a two family dwelling. There was a town resolution approving a variance to maintain the premises as a pre-existing multiple family dwelling subject to installation of a septic system. His review of the records indicate that someone had approved the septic system. Furthermore, he determined that because a certificate of occupancy had been issued that the town must have determined that the owner was in compliance with all zoning requirements.

Prior to obtaining the warrant, none of the agents contacted the Rochester Telephone Company, Rochester Gas and Electric Company, the United States Postal Service or the Town of Greece concerning the premises or its occupants.

---

1. At the suppression hearing, Mrs. Minnitti testified that she spelled her name differently than her son did. He changed the spelling of his name to "Maneti."

Defendant also submitted as part of his proof, two video recordings that he made of his home and the area surrounding it on December 24, 1990 and January 3, 1991. These videos were taken on a bright, clear day. Obviously, these videos do not accurately portray the precise conditions on February 15, 1990, because the video was made many months after the search warrant was executed. In addition, the video was filmed during daylight hours on a clear day, while the officers observed the premises on a dark, rainy evening. Nevertheless, the Court received the exhibits for the limited purpose of viewing the general condition of the premises and the nature of the neighborhood. The Court also received photographs submitted by both sides which depict the condition of the premises.

The videos and the photographs show 3457 Latta Road to be a large white two-story colonial farmhouse. The building appears to be much larger and older than the other houses on the same side of the street. These other houses appear to be single-family, ranch-style homes. There is a commercial farm market across the street.

It is clear that the house is large, but only when one observes it from the side and can see that it stretches back for some distance into the lot. When one views the house from the front, it merely appears to be a traditional white colonial with a porch. The size of the house is not apparent from the front. The videos clearly show several very large evergreen trees and shrubs, which block portions of the front of the house as well as the east and west sides of the house. There is a large evergreen that blocks the view from the road on the west side of the house, where the electric meters are located. The best view of that side of the house is obtained by leaving the road and walking into the vacant adjacent lot next to the premises. Even in the daylight, the several large evergreens and shrubs block a substantial portion of the house. On the east side of the house, there are two side doors and if one is positioned right next to those doors, in the daylight, it does appear that there are two separate doorbells.

When viewing the house in the video from directly across the street (where the agents were located), the house appears to be a single-family home. In my view, there is no observable indication to the contrary from this position.

Even in daylight, when approaching the premises by automobile, it is difficult to observe much about the premises because a significant portion of the home is blocked by large evergreen trees and shrubs. The two electric meters on the west side of the house are blocked to some extent by bushes and shrubs and it would appear to be almost impossible to observe those meters from the road in the dark.

## B. *Suppression of Physical Evidence.*

Defendant moves to suppress silencers and other items that were seized from his home on February 15, 1990, pursuant to the search warrant. He argues that the warrant was not supported by probable cause and that the warrant was defective on its face because it failed to describe the place to be searched with sufficient particularity, in violation of the Fourth Amendment. Specifically, he claims that the warrant did not distinguish between the two apartments located at the 3457 Latta Road address, which law enforcement agents should have known were separate dwelling units.

In response to defendant's motion, the Government claims that the sworn affidavit filed in support of application for the warrant establishes probable cause. Furthermore, the particularity clause of the Fourth Amendment was not violated because the officers reasonably believed that 3457 Latta Road was a single-family dwelling. Finally, the Government maintains that even if the warrant was somehow deficient, suppression is not warranted here because the officers acted in good-faith and in reasonable reliance upon a validly executed search warrant. *See United States v. Leon*, 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984).

## 1. Probable Cause.

██ Defendant first objects that the warrant under which the agents searched his residence was not based on probable cause. In my view, defendant's challenge to the validity of the search warrant is without merit. I have carefully reviewed the application for the warrant and I believe that there was ample basis for concluding that probable cause existed in this case.

The Supreme Court has clearly indicated that the conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *Jones v. United States*, 362 U.S. 257, 270–71, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).

*Gates* requires that a court considering the sufficiency of an agent's affidavit look at the "totality of the circumstances." *Gates, supra*, 462 U.S. at 231, 103 S.Ct. at 2328. In employing this flexible standard, the Supreme Court in *Gates* stated:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a *fair probability that contraband or evidence of a crime will be found in a particular place.* And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* at 238–39, 103 S.Ct. at 2332 (citations omitted) (emphasis added).

██ Defendant also claims that the warrant affidavit provided no factual nexus between 3457 Latta Road and the sought-after items. Because the affidavit did not mention whether Shacket delivered the silencers to Maneti's home or whether Shacket actually saw the silencers there, defendant contends that probable cause was lacking. Contrary to defendant's assertions, however, a warrant may issue even in the absence of "direct, first-hand, or 'hard' evidence" linking the criminal objects to a particular place. *United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985); *see also United States v. Malin*, 908 F.2d 163, 165 (7th Cir.) ("direct evidence . . . is not necessary to a probable cause determination"), *cert. denied*, —— U.S. ——, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990); *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir.1985). Rather, an issuing court need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit; a court need not determine that the evidence is *in fact* on the premises. *Malin*, 908 F.2d at 166.

██ Moreover, in making a probable cause determination, a judge " 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.' " *Malin*, 908 F.2d at 166 (quoting *United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986)); *see also United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985) (agent's expert opinion as to where a suspect is likely to keep evidence of his illegal activity is an important factor when making probable cause determination); *United States v. Jackstadt*, 617 F.2d 12, 14 (2d Cir.) (magistrate entitled to make reasonable inferences from the facts stated in affidavit), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). In the case of firearms, courts have held that a reasonable inference of where one would likely keep such evidence is at home. *See, e.g., United States v. Anderson*, 851 F.2d 727, 729 (4th Cir.1988) (reasonable to believe that defendant's gun and silencer would be found in his residence), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir.1975) (people who own firearms generally keep them at home or on their persons); *United States v. Rahn*, 511 F.2d 290, 293 (10th

Cir.) (it was reasonable to assume that individuals keep weapons in their homes), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

In *Anderson*, 851 F.2d 727, for example, the defendant argued that probable cause was lacking because the warrant affidavit contained no facts that the objects of the search, a pistol and silencer, were located in his residence. The government contended, on the other hand, that "it was reasonable to assume that individuals keep weapons in their homes." *Id.* at 729. In agreeing with the government's position, the Fourth Circuit upheld the validity of the warrant, stating:

> It was reasonable for the magistrate to believe that the defendant's gun and the silencer would be found in his residence. Therefore, even though the affidavit contained no facts that the weapons were located in defendant's trailer, we reject his argument that the warrant was defective.

*Id. See also United States v. Hatfield*, 599 F.2d 759, 762 (6th Cir.1979) (not unreasonable for magistrate to infer that defendant "*probably* maintained illegal firearms somewhere on his premises" even though affidavit contained no "hard" facts that weapons would be found there).

Based on the affidavit before me, it is clear that there was more than a "fair probability" that contraband or evidence of a crime would be found in the defendant's residence. Special Agent Roward's affidavit states that Marvin Shacket, who was a target of the investigation, told a confidential informant that he sold ten silencers to another individual for $125.00. Upon his arrest and debriefing, Shacket informed law enforcement officers that he made the ten silencers and sold them to Jesse Maneti. Shacket further stated that only two weeks prior to the debriefing he spoke with Jesse Maneti and Maneti indicated "that he was keeping the devices to use them as firearms silencers." Shacket also provided the officers with Maneti's home telephone number and the street where Maneti lived.

■ There is no requirement that the agents or the magistrate be absolutely certain that the items sought to be seized will be located in the place to be searched. All that is required is a "fair probability." According to the affidavit, Maneti was "keeping" the devices to use as silencers. It is a reasonable inference that Maneti would "keep" the devices close at hand—namely in his home. Therefore, I hold that under the totality of the circumstances the Magistrate had a substantial basis for concluding that there was a fair probability that the firearm silencers would be located in Maneti's home.

2. Particularity.

The Warrant Clause of the Fourth Amendment expressly forbids the issuance of any warrant unless it "particularly describ[es] the place to be searched and the persons or things to be seized." The Supreme Court has made clear that the purpose of this particularity requirement is to prevent general searches. *See Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016 (1987); *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976).

> By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Garrison,* 480 U.S. at 84, 107 S.Ct. at 1016.

In *Garrison,* law enforcement agents suspected Lawrence McWebb of criminal conduct and obtained a warrant authorizing a search of "premises known as 2036 Park Avenue third floor apartment." *Id.,* at 80, 107 S.Ct. at 1014. At the time they applied for the warrant and conducted the search, the officers reasonably believed that only one apartment unit existed on the third floor of the building described in the warrant. In fact, the third floor was actually divided into two separate units, one of which was occupied by McWebb, and the other by Garrison. The officers executed the warrant and began searching defendant Garrison's apartment, reasonably be-

lieving it to be McWebb's, before they discovered that the third floor contained the two apartments. After finding contraband in Garrison's apartment, the officers realized that there were two separate units. At that point, they discontinued their search. Garrison, who was not the target of the warrant, was subsequently indicted. Prior to trial, Garrison invoked the particularity requirement in the Fourth Amendment in support of his suppression motion.

■ In deciding whether the factual mistake invalidated the search warrant, the Supreme Court ruled that the constitutionality of the police officers' conduct must be judged "in light of the information available to [the officers] at the time they acted." *Id.*, 480 U.S. at 85, 107 S.Ct. at 1017. Significantly, the Court found that the subsequent discovery of facts demonstrating that a valid warrant was unnecessarily broad will not retroactively invalidate the warrant. *Id.* Rather, "[t]he validity of the warrant must be assessed on the basis of the information the officers disclosed, or had a duty to discover and to disclose, to the issuing magistrate." *Id.* The *Garrison* Court concluded that a search warrant inaccurately identifying the place of the search will, nevertheless, be upheld against a particularity challenge if the warrant described the structure as it was known or should have been known to the officers after reasonable inquiry under the circumstances. *See id.; United States v. Noel,* 938 F.2d 685 (6th Cir.1991).

■ Against this backdrop, I must determine whether the officers' factual "mistake" concerning the internal layout of 3457 Latta Road invalidated the search warrant. Under *Garrison*, the test is whether the officers described the premises sufficiently based on information that was known to them or should have been known to them after reasonable inquiry under the circumstances.

Defendant does not challenge the execution of the warrant here. Rather, as in *Garrison*, he argues that the "description of [the place to be searched] was broader than appropriate because it was based on the mistaken belief" that 3457 Latta Road was a single-family dwelling. 480 U.S. at 85, 107 S.Ct. at 1017. He also contends that, given the facts available to the officers at the time they applied for the warrant, they could not reasonably have believed that 3457 Latta Road was in fact a single-family dwelling. In any event, argues defendant, the officers here did not act reasonably in discharging their duty to discover facts regarding the character and use of the premises.

After hearing the testimony of the witnesses and viewing photographs and videotape of the premises, I find that the warrant in this case was valid when issued because the agents had a reasonable belief that the defendant's residence was a single-family dwelling.

■ Clearly, if it is apparent that the premises to be searched is a multiple-family or multi-unit building, then the officers must precisely identify the particular areas of the building that they intend to search. *See Garrison,* 480 U.S. at 85, 107 S.Ct. at 1017; *United States v. Higgins,* 428 F.2d 232 (7th Cir.1970).

Absent probable cause to search the entire premises, the warrant would be too broad to satisfy the particularity requirement if the unit to be searched is not specified. *See United States v. Dorsey,* 591 F.2d 922, 928 (D.C.Cir.1978); *United States v. Hinton,* 219 F.2d 324, 325–26 (7th Cir.1955); *see also Moore v. United States,* 461 F.2d 1236, 1238 (D.C.Cir.1972) ("A single warrant cannot describe an entire building when cause is shown for searching only one apartment.")

■ As always, the ultimate test under the Fourth Amendment is reasonableness. *Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). Therefore, courts have long recognized an exception to the particularity requirement concerning premises that contain multiple units: if the building in question appears to be a single-family structure and the investigating officers neither knew nor had reason to know of the structure's actual multiple-occupancy character until execution of the warrant was under way, then the war-

rant is not defective for failing to specify a particular subunit. In other words, if the premises appears to be something that it is not, then the officers can rely on what the premises reasonably appears to be.

In *United States v. Santore*, 290 F.2d 51 (2d Cir.), *aff'd in relevant part en banc*, 290 F.2d 74 (2d Cir.1960), *cert. denied*, 365 U.S. 834, 81 S.Ct. 749, 5 L.Ed.2d 744 (1961), the defendant moved to suppress certain evidence on the grounds that the warrant failed to particularly describe the place to be searched. The description contained in the warrant identified "the premises known as 164 Hill Street, Elmont, Long Island, New York, being a one family house." *Id.* 290 F.2d at 66. Defendant contended, however, that since the house was not a one-family residence, but rather a two-family dwelling, the warrant was defective. In upholding the warrant, the Second Circuit stated:

> The house at 164 Hill Street is to all outward appearances a one-family house with a front door and a side door, and it had always been registered with the local authorities as a one-family dwelling. A few years prior to the search the interior of the house was renovated and subdivided by [the defendant], but, in contravention of local ordinances, no permission to do so was obtained from the proper authorities. Consequently no notice of this subdivision was ever given to the local officials.
>
> In view of these facts we think that the issued warrant described the premises to be searched with that "practical accuracy" we have held to be necessary. [citation omitted]. The description in the warrant was in accordance with the outward appearance of the structure ... and in view of the concealment by [defendant] of the interior alteration made by him it would be absurd to say that the Government was on notice as to it. The agents were not warned of a possible dual occupancy of the house until after they had shown the copy of the warrant to [defendant] and had entered inside. At that moment it was too late for them, consistent with the success of their mis-

sion, to have retreated and obtained a new warrant.

*Id.*

Similarly, in *United States v. Noel*, 938 F.2d 685 (6th Cir.1991), the court upheld a warrant that authorized the search of "a single family dwelling commonly known as 751 Richmond," which, upon execution of the warrant, was found to have been subdivided into three separate units. In rejecting the defendant's argument that the fruits of the search should have suppressed on particularity grounds, the Court noted:

> At the time [the officers] executed the warrant, the rear units had no exterior designations or identifying addresses, nor were they equipped with separate mailboxes. Hence, there existed no outward indication that the facility located at 751 Richmond Avenue was other than a single-family dwelling.

*Id.* at 686.

In *United States v. Williams*, 917 F.2d 1088 (8th Cir.1990), the court refused to invalidate a warrant that identified the place to be searched as a single-family dwelling, when in fact it was discovered to be a three story rooming house. Upon executing the warrant, the officers searched all three floors, including a room occupied by the defendant, and found narcotics. At a suppression hearing, defendant testified that his room had two deadbolt locks on the door and that all of the rooms in the boarding house were numbered. Defendant also produced photographs and a videotape that showed seven doorbells, numbered one through seven, next to the front entrance door. The court rejected defendant's contention that these and other facts proved that the officers could not reasonably have believed the dwelling was a single-family residence when they applied for the warrant. Instead, the court found most persuasive the fact that the house had a common driveway, entrance and mailbox, while the numbers and doorbells, which were the only external indicia of a rooming house, were difficult to see. *Id.* at 1091.

In *United States v. Dorsey*, 591 F.2d 922 (D.C.Cir.1978), the court rejected defen-

dant's suppression argument, stating that the "dearth of external indicia of multiple occupancy undercuts appellants' claims that the police knew or reasonably should have known that the dwelling served as a rooming house...." *Id.* at 930. The court noted the absence of usual outward signs of multiple residency, including "separate entrances, doorbells, mailboxes, name plates, apartment numbers, or 'room for rent' signs." *Id.; see also United States v. Davis,* 557 F.2d 1239, 1248 (8th Cir.) (warrant upheld where the "house appeared to be a single family dwelling place, not an apartment building"), *cert. denied,* 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977); *Houser v. Geary,* 465 F.2d 193, 195 (9th Cir.1972) (warrant validly issued where premises appeared to be a two story single family residence with appurtenances to the main dwelling), *cert. denied,* 409 U.S. 1113, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973).

Finally, in *Owens v. Scafati,* 273 F.Supp. 428 (D.Mass.1967), *cert. denied,* 391 U.S. 969, 88 S.Ct. 2043, 20 L.Ed.2d 883 (1968), the court upheld a warrant challenged on particularity grounds. There, the court said:

> With regard to the contention that the search warrant failed to describe the premises with particularity, ... there was no showing at any stage of the State court proceedings, and there has been no showing to date, that 1 Thomas Park appeared to be a multiple unit dwelling. The State court record indicates, to the contrary, that there was only one door from the outside, which opened into a hallway which gave access to the entire house. There has been no showing that the police officers knew or should have known from its principal appearance that 1 Thomas Park was a multiple dwelling house when they applied for the warrants....

*Id.* 273 F.Supp. at 429.

In short, the dwellings at issue in these cases were large houses that had been subdivided into apartments. In each case, there were few "external indicia of multiple occupancy" to put the police officers on notice of the multi-unit character of the building. *Dorsey,* 591 F.2d at 930.

In the present case, the lack of the normal external indicia of multiple occupancy, supports the Government's contention the agents had no reason to know that 3457 Latta Road contained two separate apartments. The agents were entitled to rely on the outward appearance of the premises in applying for the warrant.

As in the cases cited above, the dwelling in question displayed virtually no outward signs of multiple occupancy. The dwelling does not have separate visible doorbells, mailboxes, speaking tubes, name plates, or apartment numbers to indicate multiple residency.

The few outward signs of multiple residency that 3457 Latta Road does possess are difficult to see or could be easily overlooked. For example, the dual electric meters are completely obscured from view from the road by large evergreen trees. Moreover, the two side entrances do not appear to be separate entrances at all. There are no apartment numbers on or above the doors and there are no separate mailboxes, name plates or speaking tubes near the doors. The doorbells are visible only if one is on top of them and they certainly cannot be seen from the road. In my view, the common driveway, front entrance, single address and lone curbside mailbox and newspaper chute are factors that clearly indicate single-family residency. In addition, all of the other residential houses in the neighborhood appear to be single family dwellings. The subject premises is not located in a busy, commercial area where apartments might flourish. The house is larger than the surrounding homes but to all outward appearances this home appears to be a large, old farmhouse that pre-dated the newer, smaller ranch homes on the street.

■ Equally unpersuasive is defendant's claim that the agents failed to act reasonably in this case. Defendant contends that before applying for the warrant, the agents should have made further inquiry of the local municipality and the local utility companies to determine whether

there might be separate units contained within the premises. Although those steps might have been taken, under the circumstances presented to the officers at the time, I do not believe that such inquiry was required. The officers took reasonable steps to describe the premises and that is all that is required.

Before applying for the warrant, the agents drove out to 3457 Latta Road and obtained a description of the premises. The agents testified that they observed a large, two-story, white, wood-frame farmhouse. Specifically, they noticed a single curbside mailbox and newspaper chute with the numerals 3–4–5–7 affixed to the mailbox. The officers could not see the two electric utility meters, which were obscured by the trees and darkness. Nor did they notice the two doors on the side of the house. Even if they had seen two doors, that would not signal the existence of multiple units. The officers did see one driveway leading to a 2–car detached garage.

The Government has also shown that a prompt search of 3457 Latta Road was imperative. The agents did not have days during which to assemble extensive information on the house. During his debriefing, Marvin Shacket stated that he had sold silencers to Jesse Maneti. Shea and Stebbins, who were co-conspirators of Shacket, had been released following their arraignment on February 15, 1990. The agents were understandably concerned that evidence might be removed or destroyed if Shea or Stebbins contacted Maneti to warn him of the arrests. The agents did not create this exigency. Maneti's criminal activity had not been definitively established until Shacket had been arrested and agreed to cooperate with the agents. Because Shacket and the other co-defendants, who were not cooperating, had been promptly released, there was a need to promptly obtain the warrant or risk the removal or destruction of the evidence.

Had the visual observations of the agents reasonably suggested the possibility of multiple units, then it may have been unreasonable for the agents, regardless of time constraints, to fail to conduct further inquiry. In this case, however, based on what the agents observed, they cannot be faulted for acting promptly without further inquiry.

Agent Roward's failure to notice the names of two other Manetis listed at the same address in Polk's City Directory does not require a finding that the agents acted unreasonably. Multiple names under the listing "Maneti" does not necessarily suggest multiple apartments. This listing could also have suggested only that a single family, named Maneti, lived at 3457 Latta Road. That inference is strengthened by the fact that the listing contains only a single address, which does not note either a "front" or "rear" apartment.

Defendant claims, however, that the agents' failure to check with the utility companies and town officials to determine if there were multiple units at 3457 Latta Road is fatal to the validity of the warrant. Although in hindsight it might appear to have been better practice to check with the utility companies, I am not prepared to say that under all the circumstances presented to the agents here, that the failure to do so invalidates this warrant. Such a holding would in essence place upon law enforcement agents the requirement of checking with the utility companies in every case. The Court rejects defendant's attempts to impose upon the Government a checklist that must be adhered to in all investigations. The Supreme Court has made clear that the test is one of reasonableness under the circumstances, and "[t]echnical requirements of elaborate specificity once exacted under common law pleadings have no place in this area." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). In my view, the agents acted reasonably under the circumstances in their belief that 3457 Latta Road was a single-family dwelling.

Furthermore, a check with the utilities would have showed that separate electrical and telephone service was provided to defendant's mother in the premises. This information would not have established conclusively whether there were two separate apartments without common access in

the building. Especially when in-laws are concerned, this utility information was not conclusive concerning the nature of the living space.

The information from the town was conflicting, even at the suppression hearing. The parties presented conflicting testimony by Town of Greece officials concerning the permissible use of 3457 Latta Road. Thus, even if the agents had checked with town officials regarding the character and use of the premises, depending on which official they contacted, there is a strong possibility that the agents would have been told that the dwelling was a single-family residence.

Further, this is not a case where the agents intended to search one place and ended up searching another because of a factual mistake, as was the situation in *Garrison*. In this case, the agents intended to search *Jesse Maneti's home* and that is what occurred. When they approached the premises on the night in question, defendant's mother directed the agents to his apartment and that is the only part of the premises that was searched. Mrs. Maneti's living space was not searched.

Under all of the circumstances, there is no basis to invalidate the warrant for failure to describe the premises with particularity.

3. Good–Faith Exception.

■ Even if the warrant in this case was somehow deficient, the search would still be a valid one under the reasonable reliance or good-faith exception to the exclusionary rule recognized by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 85 L.Ed.2d 677 (1984). *See also United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987). In *Leon*, the Supreme Court held that evidence obtained pursuant to a facially valid search warrant, later found to be invalid, was admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant. The *Leon* Court reasoned that the sanction of suppression would serve no useful purpose where the officers who conducted the search acted in reasonable reliance on a warrant issued by a detached judicial officer.

There is no reason why the "good-faith exception" rule announced in *Leon* should not apply in this case. Defendant has made no showing that the first and third "exceptions" to the *Leon* rule should apply here, either because the affirming officer knowingly submitted false information to the reviewing judge or because the executing officers had no reasonable basis to rely on the warrant. *See United States v. Cardall*, 773 F.2d 1128, 1132–33 (10th Cir. 1985) (only where reliance on the warrant was "wholly unwarranted" that good faith is absent and suppression may be appropriate).

Even if Agent Roward's affidavit in support of the warrant failed to establish probable cause, the affidavit was not so lacking in facts that a reasonably well-trained officer would have known that the search was illegal despite judicial authorization. *See Cardall*, 773 F.2d at 1133. Indeed, "[i]t is the judicial officer's responsibility to determine whether probable cause exists to issue a warrant, and, in the ordinary case, police officers cannot be expected to question that determination." *Illinois v. Krull*, 480 U.S. 340, 349, 107 S.Ct. 1160, 1167, 94 L.Ed.2d 364 (1987). In the present case, the agents' reliance on the magistrate's issuance of the warrant was objectively reasonable. *See United States v. Merida*, 765 F.2d 1205, 1214 (5th Cir.1985) (agents' reliance on warrant reasonable despite fact that the affidavit was insufficient "because of an inadequate showing of a nexus between the items sought and the location to be searched"); *United States v. Savoca*, 761 F.2d 292, 295 (6th Cir.) (same), *cert. denied*, 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985).

Moreover, I am not persuaded by defendant's claim that Agent Roward knowingly submitted false information to the magistrate. There is simply no material evidence to support such a conclusion.

As to defendant's claim that the warrant failed to describe his residence with sufficient particularity, an honest mistake was made by the agents concerning the layout

of 3457 Latta Road, and their conduct should be gauged by the standards set forth in *Leon* and *Garrison.* The agents had a reasonable and objective basis on which to conclude that the warrant authorized a search of Jesse Maneti's residence at 3457 Latta Road. "Here, one who looked simply at the warrant, or at both the warrant and the supporting affidavit, would not suspect that it was invalid." *United States v. Gordon,* 901 F.2d 48, 50 (5th Cir.) (applying *Leon* good-faith exception to defendant's particularity challenge), *cert. denied,* —— U.S. ——, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990).

In my view, suppression of the evidence seized from defendant's residence would run counter to the reasoning of both *Leon* and *Garrison. See Garrison,* 480 U.S. at 89 n. 14, 107 S.Ct. at 1019 n. 14; *see also United States v. Owens,* 848 F.2d 462, 466 (4th Cir.1988) ("While the warrant here was facially deficient because an incorrect apartment number was given, the deficiency was corrected prior to the search by personal observations and information on which one could reasonably and in good faith make a determination of the actual place the warrant authorized to be searched.") Consequently, I find no basis for suppression since the officers executing the warrant acted in good-faith reliance on the decision of the issuing magistrate.

### C. *Suppression of Statements.*

 Defendant Maneti also moves to suppress oral statements that he made to the police during a search of his home on February 15, 1990. He claims that his statements should be suppressed because his freedom of movement was significantly restricted and he was subjected to custodial interrogation without being advised of his rights under the Fifth and Sixth Amendments.

After carefully reviewing the testimony of the witnesses and the arguments of counsel, I conclude that defendant was never in custody on February 15, 1990, and therefore was not entitled to warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Con-

sequently, defendant's statements are admissible evidence in this case.

Consistent with *Miranda,* statements made by an individual during custodial interrogation are inadmissible if not preceded by a series of warnings. "Custodial interrogation" has been defined to include situations in which a defendant has been "taken into custody or otherwise deprived of his freedom of action in [a] significant way." *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976) (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612); *see also Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) *(per curiam); United States v. Burke,* 700 F.2d 70, 83–84 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

The Supreme Court has stated that "the ultimate inquiry [in determining whether an individual is in custody] is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) *(per curiam )* (quoting *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714). In defining what constitutes "custody" sufficient to trigger the need for *Miranda* warnings, the Supreme Court has sharply distinguished between situations in which an individual is under arrest and those in which he is not. *Berkemer v. McCarty,* 468 U.S. 420, 441–42, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

 Furthermore, the Court of Appeals for the Second Circuit has held that "the governing inquiry in assessing the custodial quality of an interrogation for *Miranda* purposes is an objective one." *United States v. Kirsteins,* 906 F.2d 919, 923 (2d Cir.1990). Because the inquiry in this case "focuses on whether a reasonable person in the same situation would have believed that he was not free to leave," the defendant's "subjective understanding is therefore irrelevant." *Id.; see also United States v. Ceballos,* 812 F.2d 42, 46 (2d Cir.1987) ("Whether a reasonable person would have believed that he was free to

leave is to be determined from the circumstances *as they unfolded* before [the person claiming that he was in custody]." ) (emphasis in original).

Clearly, defendant was not "in-custody" when he made incriminating statements to the ATF agents on February 15, 1990. The facts simply do not support defendant's contention that his freedom of movement was so restricted as to create a custodial situation necessitating *Miranda* warnings. It is undisputed in the instant case that defendant was not arrested on the day of the search. In fact, Maneti repeatedly asked the agents if he was going to be arrested and they assured him that he was not. The agents were at the house pursuant to a search warrant and they so advised Maneti. The agents did not have an arrest warrant. After the agents completed the search, they left the premises and Maneti remained there.

Maneti was never restrained in handcuffs in the house and he was able to speak freely with family members who were present during the search and during his conversation with the officers. Defendant was not compelled to answer any questions nor was he compelled to remain in the presence of the questioning agents. In fact, defendant never asked to leave the house. The agents made it clear to defendant when the warrant was executed that their only purpose for the search was to locate silencers, which they had probable cause to believe were located in defendant's house.

Likewise, there is no evidence that the agents did anything to make him feel that their visit would be anything but temporary, or that defendant was "completely at [their] mercy." *Berkemer,* 468 U.S. at 437–38, 104 S.Ct. at 3149. The search and questioning lasted only a brief time. No agent threatened defendant with arrest if he refused to cooperate, or promised leniency in return for particularly helpful behavior. *United States v. Guido,* 704 F.2d 675, 677 (2d Cir.1983). Nor does defendant contend here that the agents' questioning took on a hostile or confrontational tone. Defendant never requested an attorney and he never indicated that he wished to discontinue speaking with the agents. Rather, he spoke quite freely with them. There is no evidence that his statements were involuntary.

Defendant claims that his freedom of movement was unduly restricted because Special Agent Cuyler accompanied him during the search. However, Agent Cuyler testified that it was the defendant who led the agents to the basement in order to disclose the location of the silencers. Maneti then returned to the living room upstairs followed by Agent Cuyler. In my view, this does not prove that defendant's freedom of movement was significantly restricted during the search. In any event, even if defendant was accompanied by an agent during the search, this certainly does not constitute "custody" or restraint of freedom sufficient to require *Miranda* warnings. Indeed, the agents may have been concerned that defendant might compromise the search if he were allowed to move without escort through the house.

In cases where questioning takes place in surroundings familiar to the accused—such as in his own home, courts have been less likely to find a custodial situation. For example, in *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), a defendant questioned in his home for several hours by Internal Revenue Service agents failed to show the "custody" necessary to trigger *Miranda* warnings. Similarly, in *United States v. Dornhofer,* 859 F.2d 1195 (4th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989), a defendant questioned in his apartment concomitant with the execution of a search warrant was held not to be "in custody." *See also United States v. Gregory,* 891 F.2d 732, 735 (9th Cir.1989) (non-custodial situation and *Miranda* warnings not required when suspect consented to questioning in his home with wife present and agents had returned their guns to their holsters); *United States v. Hocking,* 860 F.2d 769, 772–73 (7th Cir.1988) (*Miranda* warnings not required when questioning conducted in suspect's home, because not a custodial situation). The instant case re-

sembles those cited above in that the questioning took place in defendant's home and did not result in a custodial experience.

Additionally, the circumstances here are far less custodial than was the case in other decisions where the Supreme Court and the Second Circuit determined that the defendant was *not* in custody. *See, e.g., California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983) (*Miranda* warnings not required even though questioning was designed to produce incriminating responses, took place at the police station, and occurred only after the defendant was identified as a suspect); *Oregon v. Mathiason,* 429 U.S. 492, 493, 495, 97 S.Ct. 711, 714, 714 (1977) (*Miranda* warnings not required when parolee voluntarily submitted to questioning at police station despite being questioned by officer in room with door closed); *United States v. Kirsteins,* 906 F.2d at 919 (holding that defendant was not in custody where he was questioned for hours in U.S. Attorney's office after receiving Justice Department letter requesting his presence, and was accompanied by agent to the street and back during a break in questioning).

Finally, the mere fact that defendant was the subject or target of a police investigation does not trigger the need for *Miranda* warnings. *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *Beckwith,* 425 U.S. at 345, 96 S.Ct. at 1615. "*Miranda* warnings need not be given even if the government's criminal investigation has reached the stage where the defendant is the focus of inquiry." *Burke,* 700 F.2d at 84.

Here, the facts do not show that a reasonable person would have understood this situation to be a custodial experience. *See Kirsteins,* 906 F.2d at 923. Because defendant's statements were made while not in custody, there was thus no need for the agents to give *Miranda* warnings. Defendant's statements are admissible.

## II. DISCOVERY MOTIONS

### A. *Bill of Particulars.*

Defendant requests that the Court order the Government to produce a detailed bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure.

Particulars need not be provided unless they are necessary to apprise a defendant of the charges against him so as to enable him to prepare his defense and avoid unfair surprise at trial. *See Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Moreover, the burden is on the defendant to show that nondisclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights. *See Torres,* 901 F.2d at 234. The decision to grant or deny a bill of particulars is committed to the sound discretion of the trial court. *Torres,* 901 F.2d at 234; *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987).

It is well settled that the Government is not required to particularize all of its evidence. *United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988). Nor is the Government obligated to "preview its case or expose its legal theory." *United States v. Leonelli,* 428 F.Supp. 880, 882 (S.D.N.Y.1977). Rather, " '[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.' " *Torres,* 901 F.2d at 234 (quoting *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)).

I find that a bill of particulars is unnecessary in this case. The language of the indictment adequately apprises the defendant of the acts charged and the dates on which they are alleged to have occurred. Paragraphs (b)(1)–(b)(4) of Count One of the indictment list and describe the firearm silencers and mufflers in question. Furthermore, other material relating to the charges, including several ATF reports on the firearm silencers seized from defendant's residence, has already been voluntarily disclosed by the Government. These

examination reports further describe the silencers and discuss the results of tests performed on them. Defendant's request for a bill of particulars is therefore denied.

### B. *Preservation of Rough Notes.*

■ Defendant moves for an order compelling all law enforcement agents who participated in the investigation of defendant to retain and preserve their rough notes. The Government acknowledges defendant's request to preserve these notes, but opposes defendant's motion for a court order. In my view, no order preserving the rough notes of law enforcement agents is necessary based on the Government's acknowledgement of defendant's request.

### C. *Motion in Limine to Restrict Cross-Examination.*

Next, defendant moves for an order restricting the Government's introduction of evidence of prior bad acts pursuant to Fed. R.Evid. 404(b), and of other crimes or impeachment material pursuant to Rules 607, 608 and 609. Additionally, defendant requests a pretrial hearing to determine the admissibility of such evidence.

I find that a pretrial hearing to determine the scope of the Government's cross-examination regarding evidence of prior bad acts and other crimes is unnecessary at this time. Nevertheless, the Court will review this issue with the parties at the pretrial conference. Consequently, I will defer ruling on the introduction of this evidence until that time. At the pretrial conference, the Government must set forth all the evidence of this type that it intends to use at trial.

### D. *Other Discovery Requests.*

Defendant moves for an order disclosing witness statements, or so-called Jencks Act material, immediately. The Government has represented that it will deliver this material to defendant at the pretrial conference. In my view, disclosure of witness statements at the pretrial conference is sufficient in this case. Accordingly, I will deny defendant's request that this material be delivered immediately.

Defendant also moves for disclosure of materials under Fed.R.Crim.P. 16, and pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In ruling on these requests, I have considered the extent of the Government's voluntary disclosure of information, which has been considerable, and the Government's acknowledgement of its continuing duty to disclose material discoverable under Rule 16 and *Brady.* As requested, the Government has provided a copy of defendant's arrest record, as well as the oral statement defendant made to law enforcement officials on February 15, 1990. Moreover, the Government has indicated that it possesses plea agreements and prior criminal records for several witnesses and that these items will be delivered to defendant along with Jencks Act material at the pretrial conference. I am satisfied by the Government's representations here and there is no need for an order as requested by the defendant. Defendant's additional discovery motions are, therefore, denied, except to the extent that the Government has provided or has agreed to provide the documents requested.

### III. CONCLUSION

Based on the foregoing discussion, it is hereby ORDERED that:

1. Defendant's motion to suppress physical evidence seized from and statements made at his home is denied;

2. Defendant's motion for a bill of particulars is denied;

3. The Government must deliver to defendant all witness statements, or so-called Jencks Act material, at the pretrial conference; and

4. Defendant's additional discovery motions are denied, except insofar as the Government voluntarily supplied the requested material or has agreed to do so.

IT IS SO ORDERED.