**UNITED STATES of America,
Petitioner–Appellant,**

v.

**Mikelis KIRSTEINS,
Respondent–Appellee.**

**No. 1190, Docket 89–6299.**

United States Court of Appeals,
Second Circuit.

Argued May 2, 1990.

Decided June 27, 1990.

Ronnie L. Edelman, Washington, D.C. (Neal M. Sher, Bruce J. Einhorn, Office of Sp. Investigations, U.S. Dept. of Justice, Washington, D.C., Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., William F. Larkin, Asst. U.S. Atty., Syracuse, N.Y., of counsel), for petitioner-appellant.

Donald J. Martin, Syracuse, N.Y. (Martin & Martin, Syracuse, N.Y., of counsel), for respondent-appellee.

Before KAUFMAN, FEINBERG and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This appeal arises from a civil denaturalization proceeding. The government brought this interlocutory appeal under 28 U.S.C. § 1292(b) (1988) to overturn Judge McAvoy's suppression of statements made by appellee Mikelis Kirsteins. The statements in question were made to Justice Department attorneys in the course of an interview requested by the government. The district court found that a combination of factors—Kirsteins' culturally conditioned response to governmental procedures, the manner of delivery and contents of the letter requesting his presence at the interview, and various aspects of the interview environment—established that the interview was custodial in nature. The district court therefore ruled that *Miranda* warnings should have been given to Kirsteins. We disagree and reverse.

## BACKGROUND

The United States filed a complaint on July 15, 1987 in the Northern District of New York seeking to revoke Kirsteins' citizenship pursuant to section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a). The complaint alleged that Kirsteins, who entered this country in 1956 and became a United States citizen in 1965, personally assisted in the persecution of Jews as a member of the Latvian Security Auxiliary Police, or "Arajs Kommando," an organization of Latvians allegedly under the command of the occupying Nazi forces during the Second World War. Because Kirsteins did not disclose these activities in his application for a visa to enter the United States or in his application for naturalization, the government sought a declaration that his citizenship and certificate of naturalization had been procured illegally and a judgment revoking that citizenship under 8 U.S.C. § 1451(a).

On November 21, 1988, the government filed a motion for summary judgment on count V of the complaint, which charged that Kirsteins procured his citizenship illegally because he lacked the required "good moral character" in that he willfully concealed his activities in the Arajs Kommando in order to secure the benefit of the immigration laws. In support of the motion, the government attached transcripts of an interview with Kirsteins conducted by

lawyers from the Justice Department's Office of Special Investigations ("OSI") in two sessions, February 17 and 23, 1987, in the United States Attorney's Office in Syracuse, New York. In that interview, Kirsteins admitted, under oath, that he had voluntarily become a member of the Arajs Kommando shortly after the German occupation of Latvia, that the group had rounded up and executed Jews, that he had personally stood guard as Arajs Kommando gunners executed Jews, and that he had concealed his wartime affiliation with the group in order to gain entrance into the United States.

Kirsteins responded with a cross-motion *in limine* to suppress his statements on the grounds that they had been made in the course of a custodial interrogation and that *Miranda* warnings had been required but not given. Judge McAvoy held that *Miranda* warnings were required if it could be established that Kirsteins was subjected to custodial interrogation. He therefore scheduled an evidentiary hearing to explore more fully the facts surrounding the interview.

Five witnesses testified at the hearing, including Kirsteins and the OSI attorneys who conducted the interview. We summarize the district court's findings as follows. *See United States v. Kirsteins*, No. 87–CV–964, slip op. at 2–13, 1989 WL 98628 (N.D.N.Y. Aug. 21, 1989) (Memorandum–Decision and Order). Kirsteins was born in Russia in 1916. His native tongue is Latvian, though he speaks some other languages, including English. He entered the United States in 1956 and eventually gained employment as a supervisory veterinary medical officer for the United States Department of Agriculture, a position he held for some twenty years before retiring.

In January 1987, Kirsteins received at his home an overnight letter requiring a return receipt. Written on official Department of Justice stationery, its entire text read:

Dear Mr. Kirsteins:

You are requested to appear for an interview by Justice Department personnel at the Office of the United States Attorney, Room 369, Federal Building, South Clinton Street, Syracuse, New York 13260. The interview is scheduled for Tuesday, February 17, 1987 at 10:00 a.m. Please ask the receptionist for Philip L. Sunshine, Esquire.

The interview will concern matters relating to your immigration to the United States. In addition, your activities during the period 1941 to 1945 will be the subject of some questions. It is requested that you have available at the interview all documents, correspondence, and photographs in your possession which were prepared during 1941 to 1945, or which relate to your activities during 1941 to 1945, or which relate to your application(s) for immigration to the United States of America or to any other country.

At the February 17, 1987 interview, the Justice Department will provide an interpreter to assist you, if necessary. In addition, although you are not required to have an attorney present at the interview, you may choose to be accompanied by an attorney at your own expense. Please call Philip L. Sunshine collect at (202) 633–5023 or (202) 633–2502 on Thursday, February 5, 1987 to notify him whether you will require an interpreter at the interview and to make specific arrangements.

Sincerely,
/s/
Neal M. Sher
Director
Office of Special
Investigations
Criminal Division
1377 K Street, N.W.,
Suite 195
Washington, D.C.
20005

The district court found that Kirsteins believed, because of his European upbringing, that he was compelled to attend the interview because it was an official request from a governmental authority. On the same day Kirsteins received the letter, he was telephoned by Philip Sunshine, the OSI lawyer who was to conduct the interview.

The two discussed the need for an interpreter, but Kirsteins decided that one would not be necessary. Although the letter invited Kirsteins to bring an attorney to the interview, he chose not to do so.

Kirsteins had never been to the Federal Building in Syracuse before his arrival there for the interview on February 17. He did not drive himself, but instead paid an acquaintance to transport him there and home again. Kirsteins entered the building through double doors which closed automatically behind him. It was the only entrance he was aware of at that time. Immediately upon entering, he encountered two guards stationed to the left of the door. When he informed them that he had an appointment at the U.S. Attorney's Office, they allowed him to proceed.

Kirsteins then took the elevator to the third floor and walked down the hall and into the reception area of the U.S. Attorney's Office. He announced himself to the receptionist who was positioned behind a glass window, then took a seat in the waiting area. Some fifteen minutes passed while he was waiting for Sunshine. During this time, Kirsteins saw several people énter the reception area, each of whom was admitted to the interior office by the receptionist's activating a security system to open the door.

Sunshine eventually appeared, dressed in civilian clothes, and led Kirsteins into the office through the security door. They entered a large conference room where a stenographer and Neal Sher, Director of OSI, also were present. Sher also wore ordinary office attire. In addition, no one was armed. Kirsteins was sworn in by the stenographer. This took him by surprise, as he had expected an "interview" to be somewhat less formal.

The questioning continued for approximately two hours, from 10:00 a.m. until noon. At that point, Kirsteins inquired as to how much longer the interview would continue. After Sher responded that it would be another hour, Kirsteins asked if he could go out to tell his driver to wait. Sher agreed. As Kirsteins was leaving the conference room, Sunshine said "I'm going with you," and accompanied him from the office. Kirsteins believed that he would not be "buzzed out" through the security door by the receptionist without Sunshine's approval. He did not have an opportunity to determine whether one could exit through the security door simply by turning the handle.

Sunshine escorted Kirsteins down a different elevator and out a different door than the latter had used to reach the office. Kirsteins' driver was parked just outside the exit. Sunshine accompanied him to the car but did not overhear his conversation with the driver. The two then re-entered the building through the same door they had exited and returned to the reception area, where Kirsteins waited briefly. Sunshine returned to escort him again through the security door. The questioning continued for another hour, after which Sunshine took Kirsteins back to the reception area. Kirsteins made his way out of the building unattended.

A few days later, Sunshine called to tell Kirsteins that there were a few more questions he wished to ask. The district court again found that Kirsteins believed he was required to comply. On Monday, February 27, Kirsteins entered the Federal Building through an unguarded door. Sunshine met him in the waiting area of the U.S. Attorney's Office, and the receptionist buzzed them through the security system. Because the questioning was a continuation of the original interview, he was not resworn. Kirsteins again did not bring a lawyer with him.

In his August 21, 1989 opinion, Judge McAvoy found that the circumstances set out above established that Kirsteins was subject to custodial interrogation and that his statements would therefore be suppressed for the government's failure to give him *Miranda* warnings. *See United States v. Kirsteins*, No. 87–CV–964, slip op. at 15–18 (N.D.N.Y. Aug. 21, 1989). He found that the letter, both in its delivery by overnight mail requiring Kirsteins' signature and in its content, would convey to a reasonable recipient an impression of the importance of the matter discussed and the

authority of the author. The court found that the letter's overall tone—for example, its recitation of a certain time and room number—implied that Kirsteins' attendance was a foregone conclusion. Similarly, the court observed that Sunshine, in his phone call to Kirsteins before the first session, did not inquire regarding the latter's willingness to attend but instead concerned himself only with the details surrounding the need for an interpreter.

Other factors found determinative by the court concerned the environment in which the interviews were conducted. Judge McAvoy concluded that the Federal Building "would clearly have an intimidating effect on a reasonable person" because of its double-locking entrance and posted guards. *Id.* at 16. Furthermore, he found that the U.S. Attorney's Office itself, to the extent that its own security system might have suggested that egress would not be entirely at the whim of the visitor, contributed to an atmosphere that a reasonable person would have perceived as custodial. Other factors weighed by the court included Kirsteins' being sworn before speaking and the fact that the interviewing attorneys were affiliated with OSI, part of the Justice Department's Criminal Division. Considering all of the circumstances, the court concluded that "a reasonable person in [Kirsteins'] position would have thought that he was in custody, that he was not free to stop the questioning or leave, or that the government attorneys would not have allowed him to leave if he so requested." *Id.* at 17. It also found that Kirsteins believed he was in custody.

The district court accordingly suppressed the statements made by Kirsteins during the interview. It thereafter granted the government's motion to certify this interlocutory appeal under 28 U.S.C. § 1292(b). *See United States v. Kirsteins*, No. 87–CV–964 (N.D.N.Y. Nov. 13, 1987) (order granting motion to amend). Because we believe that Kirsteins was not in custody for *Miranda* purposes, we reverse.

## DISCUSSION

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Su-

preme Court created a set of warnings to be given to suspects prior to the commencement of custodial interrogation. The Court defined "custodial interrogation" to mean situations in which a person being questioned "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612.

The district court found that Kirsteins believed that he was not free to leave or otherwise discontinue the interview. We do not quarrel with that finding because the governing inquiry in assessing the custodial quality of an interrogation for *Miranda* purposes is an objective one. It thus focuses on whether a reasonable person in the same situation would have believed that he was not free to leave. *See Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984). Kirsteins' subjective understanding is therefore irrelevant. Taking the facts as found by Judge McAvoy, we do not believe that a reasonable person would have understood the interview to be a "custodial" experience.

The fact that some of the details of the letter advising Kirsteins of the interview may seem to assume his cooperation cannot outweigh the fact that its language only "requested" his attendance and did not suggest any compulsion or sanction should he fail to comply. Although the letter was printed on Justice Department stationery, it bore no legend suggesting compulsion, such as "summons" or "subpoena." There is thus nothing about the *form* of the document, apart from its governmental imprint, that would distinguish it from ordinary professional correspondence.

The means of delivery of the letter was also a factor in the court's finding of custodial circumstances. Again, however, there is a considerable difference between an objective analysis and Kirsteins' subjective reaction. To be sure, some persons who receive an overnight letter requiring a signature might infer from the means of transmittal an obligatory undertaking. However, we do not believe that a reason-

able person would attribute such a meaning to that mode of delivery, much less conclude that it constituted an arrest-like constraint on freedom.

We also believe that the court's findings as to the interview environment do not, either by themselves or in conjunction with the letter, establish that Kirsteins was ever in custody. He concedes, as he must, that there was no formal arrest. His visit to the U.S. Attorney's Office was for the most part unexceptional. He entered the Federal Building through some sort of security door and immediately encountered guards. After Kirsteins had stated his business, they waved him on. Such an encounter would not strike the reasonable person as at all unusual, either for the presence of a security station at the entrance to a government office building or for the brief interruption by security personnel to determine the visitor's reason for entering. Certainly there was nothing to lead a reasonable person to believe that those conditions constituted a restraint on leaving.

Moreover, the guards allowed him to proceed freely and unaccompanied to his specific destination, the U.S. Attorney's Office. There Kirsteins became aware, while he waited in the reception area for Sunshine, that access to the inner office was being regulated by the receptionist's operation of a security door by "buzzing" it open to admit various persons. Kirsteins argues that a reasonable person might infer that exit from the inner office also could be accomplished only through the compliance of the receptionist. Even so, a reasonable interpretation of these arrangements is that they were intended for security rather than detention purposes.

The fact that Kirsteins was sworn also would not suggest to a reasonable person that he was in custody. Administration of an oath is not an indicator of restraint of one's freedom to leave.

In our view, the only factor arguably suggestive of custody was Sunshine's accompanying Kirsteins to the street and back during the break in the questioning. The reasons for the escort beyond the office itself are not immediately apparent.

However, it did not rise to the level of custodial supervision. The attorney never touched Kirsteins or physically impeded his movements in any way. Although he walked along with him at all times, he allowed him to exit onto the street, a courtesy not reasonably to be expected from a detaining agent. Moreover, upon returning, Sunshine left Kirsteins by himself in the waiting room for an unspecified period.

The Supreme Court has held that a police station is not so coercive an environment as to establish, without more, custodial restriction of freedom. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977). We do not believe that a prosecutor's office in a government building constitutes such a setting, either *per se* or in conjunction with the additional circumstances involved here.

Because the interrogation at issue was not custodial, it was error for the district court to suppress Kirsteins' statements under *Miranda* and its progeny. We reverse the certified order only to the extent it treats the interview here as custodial and remand to the district court for further proceedings consistent with this opinion.