**UNITED STATES of America,**

v.

**Rafael SALGADO, Defendant.**

No. 94–CR–227S.

United States District Court,
W.D. New York.

Jan. 3, 1996.

Patrick H. Nemoyer, United States Attorney, W.D. New York (Paul J. Campana, Assistant United States Attorney, of counsel), Buffalo, New York, for the Government.

J.C. Elso, Miami, Florida, for Defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

### *INTRODUCTION*

Before this Court are the objections of defendant Rafael Salgado to a Report and Recommendation ("R & R") of the Honorable Carol E. Heckman, United States Magistrate Judge for the Western District of New York. Magistrate Judge Heckman has recommended that defendant's motion to suppress physical evidence be denied. For the reasons set forth below, this Court will accept Magistrate Judge Heckman's Report and Recommendation and deny defendant's motion.

### *FACTS*

By Order filed December 29, 1994, this Court referred all pretrial matters in this case to Magistrate Judge Heckman pursuant to 28 U.S.C. § 636(b)(1)(A) & (B). Magistrate Judge Heckman filed a Report and Recommendation on August 9, 1995, recommending that defendant's motion to suppress physical evidence be denied. Defendant filed objections ("Objections") on September 12, 1995. The government filed a memorandum of law in response ("Response") to defendant's objections on October 19, 1995, to which defendant filed a reply ("Reply") on October 31, 1995.[1]

The facts pertinent to defendant's motion are set forth in the Report and Recommendation. (R & R, pp. 1–8.) Though defendant broadly objects to the Magistrate Judge's factual findings, this Court will not repeat a

---

1. Defendant's 25–page reply memorandum exceeds the 10–page limit for replies set forth in Rule 49.1(e) of the Local Rules of Criminal Procedure for the Western District of New York. In the interest of fairness to defendant, this Court will consider the reply with attendant warning that all future papers filed in this case must strictly comply with the Local Rules and Calendar Guidelines governing practice in this Court.

full recitation of the facts. Rather, the specific findings that relate to defendant's legal objections will be addressed in the discussion below.

## DISCUSSION

■ As an initial matter, the government contends that defendant's objections should not be considered because they are untimely. This Court previously directed defendant to file objections on or before September 11, 1995, extending the filing deadline required under Federal Rule of Civil Procedure 72(b). Defendant filed his objections on September 12, 1995, one day late. Counsel for defendant, who practices in Florida, had alerted my chambers by telephone that he was encountering certain logistical problems coordinating filing with local counsel. Based on these representations and the fact that filing a timely motion for an extension of time presumably was subject to the same logistical problems, this Court, in this one instance, will consider the objections as if timely filed nunc pro tunc.

Pursuant to 28 U.S.C. § 636(b)(1), the Court must make a de novo determination of those portions of the Report and Recommendation to which objection is made. Under Rule 58.2 of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."

Defendant presents his specific objections to the Magistrate Judge's recommendation as five separate legal issues. Recognizing that each subsequent issue defendant raises relates in some way to the last, this Court will address the objections in the order defendant presents them.

### A. Border Search

The first issue defendant raises, whether the border search exception applies to the search of his luggage, does not state an objection since defendant agrees with the Magistrate Judge's finding that the exception does not apply.

### B. Seizure of Luggage

The next issue defendant raises, and the first legal objection to the Report and Recommendation, is that the "seizure of Defendant's suitcases was without a warrant, or without exigent circumstances or even probable cause, [and thus] the seizure of the suitcases was in violation of the Defendant's Fourth Amendment rights." (Objections, pp. 9–12.)

Defendant contends that agents "seized" his suitcases in violation of the Fourth Amendment when they removed them from the trunk of Irene Garbowski's rented car. Upon full consideration of defendant's arguments and the Magistrate Judge's findings, this Court disagrees.

■ Both defendant and the government rely in part on a line of cases stemming from *United States v. Lovell*, 849 F.2d 910 (5th Cir.1988), which addressed whether the removal of luggage from airport baggage areas constitutes an unlawful Fourth Amendment seizure. As the Fifth Circuit explained, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Lovell*, 849 F.2d at 915 (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)).

■ A meaningful interference with defendant's possessory interests did not occur in this case. Defendant's luggage was in the trunk of Garbowski's rented car with Garbowski's luggage. Garbowski permitted agents to open the trunk of her car, and identified three bags as her own and the others as defendant's. She allowed agents to drive the car from the hotel to the bridge garage. In the bridge garage Garbowski consented to a search of her three bags. Agent Peter Smith put all the bags on the garage floor, searched Garbowski's, and had a dog sniff the others. Smith put Garbowski's luggage back in the trunk and the other three bags on a nearby inspection table.

The agent's removal of defendant's bags from the trunk of Garbowski's car to an inspection table a few feet away was not a meaningful interference with defendant's

possessory interest in the luggage. In *Lovell*, a case both parties cite, the Fifth Circuit reached the same result with respect to bags agents temporarily removed from an airport conveyor belt. The court explained that "[t]he momentary delay occasioned by the bags' removal from the conveyor belt was insufficient to constitute a meaningful interference with [the defendant's] possessory interest in his bags." *Lovell*, 849 F.2d at 916. The removal of defendant's bags in the instant case, as in *Lovell*, cannot be analogized to a seizure of defendant himself since the agents only asked defendant to claim the bags before he took them. The removal of defendant's unopened bags from someone else's car to a table a few feet away was not a seizure within the meaning of the Fourth Amendment. The cases cited by defendant to the contrary are inapposite.[2]

## C. *Violation of Fifth and Sixth Amendments*

Defendant next objects to the Magistrate Judge's findings that agents did not violate his rights under the Fifth and Sixth Amendments. (Objections, pp. 12–16.)

### 1. *Sixth Amendment*

■ As the Magistrate Judge correctly explained, the Sixth Amendment right to counsel does not attach until the initiation of an indictment or an adversarial judicial proceeding. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). At the time of the events at issue, defendant had not been charged nor had any criminal proceedings commenced; the Sixth Amendment objection is therefore without merit.

### 2. *Fifth Amendment*

At issue, rather, is whether agents transgressed the Fifth Amendment when they asked defendant if the bags were his and for consent to search them. The Magistrate Judge determined that the agents did not violate the Fifth Amendment because defendant was not "in custody" even if the agents' questions constituted interrogation. Defendant objects that he in fact was in custody and not free to go when he identified his luggage and consented to the search. Without reaching the government's argument that an extended secondary border inspection is not a "custodial arrest" to which *Miranda* applies,[3] this Court finds that defendant was not in custody for the reasons the Magistrate Judge explained.

■ An officer must administer *Miranda* warnings "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, — U.S. —, —, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)) (other citation omitted). "[T]he initial determination of custody depends on the objective circumstances of the interrogation...." *Stansbury*, — U.S. at —, 114 S.Ct. at 1529.

■ As the Magistrate Judge explained, Agent Smith, after speaking with Assistant United States Attorney Paul Campana, returned defendant's personal belongings to defendant and told him he was free to go. The fact that Smith told defendant that if the "bags were his he could take it" and "[i]f the

---

**2.** In *United States v. Cagle*, 849 F.2d 924, 927 (5th Cir.1988), for example, the Fifth Circuit found that there was a seizure where the prolonged detention of a suitcase caused it to miss the owner's flight. The court made "clear," however, "that the agents' removal of [the] bag from the conveyor belt, their compression of the bag to procure a scent, and their subsequent sniff of the bag did not constitute a seizure." *Id.* at 926. Any "momentary delay" occasioned on defendant by asking him to claim the luggage before he took it was not a meaningful interference with his possessory interests.

**3.** *See United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *United States v. Silva*, 715 F.2d 43 (2d Cir.1983).

bag is not yours, you can't take it" does not render the situation custodial. When Agent Gil Schmelzinger stated, "If these are your bags, tell us they're your bags and you can go," Garbowski responded, "Tell him they're your bags and let's get the hell out of here." The objective circumstances are that Agent Smith told defendant he was free to go and that Garbowski understood they were free to go and take the luggage with them if defendant claimed it. The objective facts belie defendant's claim that he was subject to a custodial interrogation.

### D. *Consent*

Defendant next objects to the Magistrate Judge's finding that he voluntarily consented to a search of his bags. (Objections, pp. 16–19.) He argues that the alleged consent was "the product of a deliberate plan of coercion by the customs officials" because without giving consent he would not have been free to leave with the luggage. (Objections, p. 18.) The facts, even as recited by defendant, do not support this conclusion.

 By the time agents requested consent to look in the bag, they had returned defendant's personal belongings to him, told him he was free to leave, and told him that he could take the luggage if it was his. Garbowski understood that she and defendant were free to leave with the luggage if he claimed it. Once defendant claimed the bags as his, he was free to take them with him. The Magistrate Judge's finding that defendant voluntarily consented to the agent's subsequent request to search the bags is fully supported by the record.

### E. *Scope of Consent*

Defendant's final objection is that agents exceeded the scope of his consent. Agent Schmelzinger requested permission to "look in" the bags, which defendant argues did not authorize agents to search the bags.

 Without restating the Magistrate Judge's findings, this Court agrees that "it is reasonable to construe the agent's request to look into the bags as a request to look at the entire contents." (R & R, p. 16.)

### CONCLUSION

After carefully reviewing the Report and Recommendation of Magistrate Judge Heckman, defendant's objections, and other materials submitted by the parties, and after considering *de novo* the matters raised by defendant, this Court accepts the Report and Recommendation, including the authorities cited and the reasons provided therein. Defendant's motion to suppress physical evidence is therefore denied in all respects.

### ORDER

IT HEREBY IS ORDERED, that this Court ACCEPTS the Report and Recommendation of Magistrate Judge Heckman filed August 9, 1995, including the authorities cited and the reasons provided therein.

FURTHER, that defendant's motion to suppress physical evidence is DENIED.

SO ORDERED.

### REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

This matter was referred to the undersigned by the Hon. William M. Skretny, to hear and report, in accordance with 28 U.S.C. § 636(b). Defendant has moved to suppress evidence obtained as a result of a warrantless search of his luggage. A hearing was held before this court on May 4–5 1995. For the following reasons, it is recommended that defendant's motion be denied.

### BACKGROUND

At approximately 6:30 p.m. on November 3, 1994, the defendant Rafael Salgado and Irene Garbowski entered the United States from the Rainbow Bridge port-of-entry in Niagara Falls, New York. The defendant and Garbowski were passengers in a taxi bearing an Ontario, Canada license plate.

### I. Testimony of Inspector Charles Young.

Charles Young, a Senior Inspector for United States Customs, testified that he was on duty at the time and that he conducted the primary inspection. Young requested

identification and both passengers produced Florida driver's licenses. When asked where he was born, the defendant stated, "Columbia". Further identification was requested and the defendant and Garbowski presented their United States passports. The defendant's passport indicated travel to Columbia in 1991 and entry into Montreal, Canada on October 16, 1994. At this point, the two passengers were referred to secondary inspection because their travel indicated a drug source country (i.e., Columbia) and Garbowski seemed nervous.

Once in the secondary inspection building, the defendant and Garbowski were requested to fill out custom declaration forms. Both stated on the forms that they were not carrying more than $10,000 into the United States. Garbowski made an oral declaration that she was carrying about $300 in United States and Canadian money. The defendant stated that he was carrying about $1,000 in United States and about $1,200 in Canadian currency.

Meanwhile, Canine Enforcement Officer Sally Barr used her dog to perform a canine sniff on the taxi cab. The result was negative. However, a brown leather satchel containing approximately $3,236 in United States and $1,258 in Canadian currency was found on the passenger seat in the back. A further search of the taxi revealed a package wrapped in carbon paper underneath the rear passenger seat. The package contained $100 bills totaling $10,000 in United States currency. Supervisory Inspector Bruce Smith testified that after the currency was found, he approved a strip search of the passengers. After the strip search, the passengers were locked into separate interview rooms. At this point, Bruce Smith notified the Niagara County Drug Task Force, which sent Detective John Humphrey to the Bridge. At about 8:00 p.m., Bruce Smith also called Special Agent Peter Smith of the United States Customs and informed him of the currency seizure (T. at 3–4).

Inspector Young testified that he and Detective Humphrey spoke to the defendant in the interview room. The defendant stated that he had left Columbia and went to Mexico to see his female friend (not Garbowski).

He then travelled to Montreal to see a friend regarding his export-import business. The defendant stated that he had been living in Columbia for about a year and that he also worked in a lemon processing plant.

After Young was finished with his questions, Detective Humphrey read the defendant his *Miranda* rights. He asked the defendant if he spoke and read English, and defendant replied "Yes". He asked the defendant if he understood, and defendant again said "Yes". Humphrey told the defendant that he should be honest but denied that he made any threats to the defendant. The detective asked the defendant several questions about his occupation and his travels in Canada. Humphrey testified that after a while, the defendant became agitated with the questions and Humphrey felt that the defendant was not being truthful. The defendant was not asked about the package found in the taxi. Both Young and Humphrey testified that the defendant did not ask for an attorney at any point.

## II. Testimony of Special Agent Peter Smith

Special Agent Peter Smith testified that he received a phone call at about 8:00 p.m. on the date in question and that he arrived at the Rainbow Bridge at around 8:50 p.m.

At sometime between 9:30—9:45 p.m., Smith began talking with Garbowski. She told him that she had arrived in Montreal on October 29th and that she had spent a couple of days with the defendant. Thereafter, they traveled to Toronto and rented a car and drove to Niagara Falls, Ontario. He further testified that Garbowski had rented a car at the Radisson Hotel in Niagara Falls, New York with her American Express Card. Smith confirmed this transaction. She also stated that there was luggage in the rental car at the Radisson and that at some point the luggage had also been in Canada. However, Smith did not ask her whose luggage it was nor did he advise her of any rights. The interview ended at about 10:20 p.m. (T. at 5–8).

After the interview with Garbowski, Smith brought the defendant from the smaller de-

tention room to the larger one where he had interviewed Garbowski. The defendant was not handcuffed or physically restrained in any way. Once the defendant was brought into the larger detention room, Smith and Special Agent Gil Schmelzinger introduced themselves as United States Customs agents and advised the defendant of his *Miranda* rights. Smith asked defendant if he understood his rights and whether he could read and write English. Defendant responded, "Yes". At this point, the defendant had not asked for an attorney nor did he state that he had already asked for one (T. at 9–11).

Smith asked the defendant several general questions about his travels and his relationship with Garbowski, which the defendant answered. Special Agent Smith also asked defendant if he was aware of the reporting requirements. The defendant stated that he was aware of the requirements. Finally, when Smith told defendant about the $10,000 that was found, the defendant did not respond but asked for an attorney. At this point, the questioning stopped and the defendant was taken to the smaller detention room without any handcuffs (T. at 11–15).

Thereafter, Smith went to speak to Garbowski again and asked her about the rental car at the Radisson Hotel. Smith asked her if she would give him the keys so that they could go see the car. Garbowski gave Smith the keys and he along with Garbowski, Schmelzinger, and Group Supervisor Tom Manifase drove to the hotel. Smith testified that the Radisson was three-tenths of a mile from the Rainbow Bridge and that it could be seen from the Bridge (T. at 15–16).

Once at the garage where the rental car was parked, Smith asked Garbowski if he could open the trunk and she said that he could. Garbowski identified three bags as hers and the others as the defendant's. Smith did not take the bags out but instead closed the trunk and asked Garbowski if he could drive the car to the bridge and she agreed that he could do that (T. at 16–18).

Smith testified that when they returned, he parked the car in the bridge garage, next to the secondary inspection area. Smith asked Garbowski to identify the luggage and then he put all bags on the garage floor. At this point, the defendant was still in the detention room. Smith then asked Garbowski if he could search her bags and she said, "go ahead". Nothing was found in the search but women's clothes. Neither Smith nor anyone else searched the defendant's luggage (T. at 18–22).

At this point Officer Barr's dog sniffed the bags but there was no response or alert as to any drugs. Smith testified that when the dog was brought in, Garbowski got very excited and she said that she did not know whose luggage the other three were. While Garbowski had name tags on her luggage there was no identification on the other three bags. Thereafter, Smith put Garbowski's luggage in the trunk and put the three other bags on an inspection table located in the garage (T. at 22–25).

Smith testified that he took Garbowski inside the customs office and got the defendant and had him fingerprinted at about 12:05 a.m. on November 4, 1994. At about 12:30 a.m., Smith contacted Assistant United States Attorney Paul Campana, who advised Smith that they could not search defendant's bags and that he should be released. Smith obtained defendant's personal belongings and told him that he was free to go (T. at 25–31).

Once in the garage, Smith told defendant that if the "bags were his he could take it." The defendant did not respond verbally but hesitated. The defendant then took one of the bags and put it in the trunk of the rental car. Smith then stated, "If the bag is not yours, you can't take it" and put the bag back on the inspection table. According to Agent Smith, Agent Schmelzinger stated, "If these are your bags, tell us they're your bags and you can go." Smith testified that at this point Garbowski said, "Tell him they're your bags and let's get the hell out of here." Smith then testified that the defendant stated that they were his bags. Then Agent Schmelzinger stated, "Can we look in your bags," and the defendant responded by saying, "Yes, go ahead." (T. at 33–36). Smith also testified that he never told the defendant that he did not have to consent, and if he had not consented then they still would have been free to go.

The search of the bags revealed a large sum of United States currency. At this point, the defendant was handcuffed and put back in the small detention room. The defendant was not advised of his rights. At about 1:10 a.m., Smith again went to interview the defendant and advised him of his *Miranda* rights. The defendant stated that he wanted an attorney and Smith stopped the questioning (T. at 40–44).

According to Agent Smith, the defendant was free to leave up until the time when he gave consent to look in his bags.

The government also produced as witnesses: 1) Sally Barr, Canine Enforcement Officer, 2) Rebecca Nuernberger–Patterson, Customs Inspector, 3) Bruce Smith, United States Customs Supervisor, and 4) Detective John Humphrey, Niagara County Drug Task Force. The testimony of the above witnesses was cumulative and not directly relevant to the issue at hand.

No witnesses were called by the defense.

### *DISCUSSION*

Defendant now moves to suppress the evidence seized as a result of the search of defendant's luggage. The defendant contends that his consent was elicited in violation of his Fifth and Sixth Amendment right to counsel. The defendant also argues that the seizure of the luggage was not within the border exception to the warrant requirement. Finally, the defendant asserts that the he did not voluntarily consent to the search of his luggage and, even if he did, the government agents exceeded the scope of his consent.

The government contends that there was no violation of his right to counsel because the defendant was never in custody when asked questions regarding his luggage. They also argue that the secondary inspection of defendant's luggage was a routine border inspection. Finally, the government contends that the defendant voluntarily consented to the search of his bags.

Each of these contentions will be addressed in turn.

### I. Custodial Interrogation

Initially, it must be pointed out that the Sixth Amendment does not apply to this case. The Sixth Amendment right to counsel attaches when there has been an indictment or adversary judicial proceedings have begun. *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In the present case, the defendant had not been charged nor had any criminal proceeding begun at the time that the customs agents sought his consent to search his luggage.

However, unlike the Sixth Amendment, the Fifth Amendment's prohibition against compelled self-incrimination attaches at the time that the defendant, who is subject to custodial interrogation, requests an attorney. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Before the Court can determine if there was a Fifth Amendment violation, it must be determined if the defendant was subject to custodial interrogation. The government argues that the defendant was not in custody at the time the agents made statements regarding ownership of the bags.

The Supreme Court had defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra,* 384 U.S. at 444, 86 S.Ct. at 1612; *Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977); *California v. Beheler,* 463 U.S. 1121, 1123, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983). Moreover, interrogation has been widely interpreted to include "either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). In essence, interrogation can extend only to words or actions on the part of law enforcement officials that they should have known were reasonably likely to elicit an incriminating response. *Id.* at 301, 100 S.Ct. at 1689–90.

The questions which took place here fall into two categories. First, the agents asked the defendant if the bags in question were his. There is a line of cases which holds that this type of question constitutes interrogation. *See, e.g., United States v. Smith,* 3 F.3d 1088 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994); *United States v. Henley,* 984 F.2d 1040 (9th Cir.1993).

■ The second question asked by the agents requested permission to search the bags. A consent to search is not a self-incriminating statement. Accordingly, a request to search does not amount to interrogation. *United States v. McCurdy,* 40 F.3d 1111, 1118 (10th Cir.1994). Every court of appeals which has addressed this issue agrees. *See, e.g., Smith, supra,* 3 F.3d at 1098; *United States v. Hidalgo,* 7 F.3d 1566, 1568 (11th Cir.1993); *Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.), *cert. denied,* 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985); *Smith v. Wainwright,* 581 F.2d 1149, 1152 (5th Cir.1978); *United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977).

Even assuming that the questions asked constituted interrogation, the defendant's Fifth Amendment right to counsel was not violated because he was not in custody. Custody is referred to as "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* —— U.S. ——, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (quoting *Beheler, supra* 463 U.S. at 1125, 103 S.Ct. at 3520). The inquiry is an objective one which focuses on whether a reasonable person in the same situation would have believed that he or she was not free to leave. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984); *United States v. Kirsteins,* 906 F.2d 919, 923 (2nd Cir.1990).

The record sufficiently establishes that when the defendant asked for an attorney at 10:30 p.m., the questioning stopped. Thereafter, Agent Smith had a conversation with the AUSA Paul Campana, who advised Smith that the defendant should be released. The defendant was then given his personal belongings and told that he was free to go. According to Agent Smith, the defendant was not under arrest and was free to leave up until the point where he gave the government agents permission to search his bags.

The defendant was not in a coercive environment. In fact, Garbowski was with him in the garage and it was at her urging that he actually admitted that the bags belonged to him. Although the defendant was admittedly in custody earlier that evening, this fact alone does not require a finding that he continued to be held in custody at the time that he was being released. *See, e.g., United States v. Donahue,* 948 F.2d 438 (8th Cir. 1991), *cert. denied,* 503 U.S. 976, 112 S.Ct. 1600, 118 L.Ed.2d 314 (1992); *United States v. Stevens,* 800 F.Supp. 892 (D.Hawaii 1992).

## II. Border Search

■ The Fourth Amendment prohibits unreasonable searches and seizures. However, border searches are reasonable *per se;* custom agents need not have probable cause or a warrant to conduct routine searches at United States borders. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). The rule has a long-standing history dating back to the founding of this country when Congress granted customs officials "plenary authority to conduct routine searches and seizures at the border ... in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez, supra,* 473 U.S. at 537, 105 S.Ct. at 3308.

Defendant contends that the circumstances of this case do not fit the routine border search exception, and as a result the evidence seized during the search of defendant's luggage should be suppressed. The government argues that the defendant was subjected to nothing more than a routine border search.

■ The unusual facts of this case do not fit neatly within the border search exception. The evidence adduced at the hearing clearly indicates that the defendant and his companion entered the United States via a taxi cab. It is also undisputed that the luggage in

question was not in defendant's possession at the time of entry. The agents drove to a nearby hotel and secured the car that was rented by Garbowski in the United States. The rental car contained both Garbowski's and defendant's baggage. Thereafter, the agents brought the rental car to the border inspection area and now claim that the ultimate search of the luggage and seizure of the money falls within the routine border exception. However, there is no substantial connection between the luggage that was searched at about 12:30 a.m. on November 4, 1994 with the entry of defendant into the United States at 6:30 p.m. the day before. Under these circumstances, it strains credulity to characterize this incursion as a border search.

Nevertheless, the term "border area" has been given an elastic connotation. *See, United States v. Glaziou*, 402 F.2d 8 (2d Cir. 1968). It is from this expansive definition that courts have created two different concepts for what constitutes a border, for purposes of a United States Customs search: 1) the "extended" border search, and 2) the "functional equivalent" of the border. *See, United States v. Gaviria*, 805 F.2d 1108 (2d Cir.1986), *cert. denied*, 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987).

■ The extended border concept applies to searches conducted after someone or some property has cleared the initial customs checkpoint and entered the United States. *Id.* at 1112. While an extended border search does not require a warrant, it does require reasonable suspicion due to the greater intrusion on a person's legitimate expectations of privacy. *See id.*

■ There was no evidence at the hearing to establish that the defendant had entered the United States with the luggage at 6:30 p.m. on November 3, 1994. This may be a logical assumption because of defendant's travel itinerary. However, that is not enough to create an extended border search. To expand the definition of an extended border search to fit the circumstances of this case would inevitably lead to an illogical application of the concept and diminish a person's legitimate expectations of privacy. Therefore, the Court finds that the search of

the luggage was not an "extended" border search.

■ Nor can the search be deemed to have been done at a functional equivalent of a border. Airports have generally been considered the functional equivalent of a border. As the court stated in *Gaviria*, the analogy is due to several factors:

(1) the existence of reliable indications that the thing to be searched is of international origin and has not been changed in any way since entering the United States; and (2) the degree of regularity with which searches at the point in question are conducted such that the intrusion is minimal, the existence and function of the checkpoint are known in advance, and there is little discretionary enforcement activity.

*Id.* (citing *United States v. Sheikh*, 654 F.2d 1057, 1069 (5th Cir.1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982)). While the search in question might fit the second prong of the test, there was no testimony at the hearing to establish that the contents of the bags that were searched had not changed in any way since they had entered the United States. Consequently, on the facts presented, the Court holds that the warrantless customs inspection was not the functional equivalent of an international border search.

## III. Consent

The final issue in this case is whether the warrantless search of defendant's luggage was nevertheless justified by defendant's knowing and voluntary consent. It is to this issue that the court now turns.

■ It is not disputed that a warrantless search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). However, the government has the burden of establishing by a preponderance of the evidence that the defendant's consent was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir.1993). In determining whether a consent

to search is voluntary in the constitutional sense, the court must consider the "totality of circumstances". *Schneckloth, supra,* at 248–49, 93 S.Ct. at 2058–59; *United States v. Hernandez,* 5 F.3d 628, 632–33 (2d Cir.1993).

The factors considered in determining voluntariness include the defendant's age, education and intelligence; the length and conditions of any detention; whether there has been repeated questioning; whether the subject is intoxicated or under the influence of drugs, deprivation of food or sleep; implied threat or covert force; and deceptive promises. *See Schneckloth, supra,* 412 U.S. at 226, 228, 93 S.Ct. at 2047, 2048; *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

The totality of circumstance in this case support a finding of voluntary consent. The defendant understood English and had no difficulty communicating with the agents. In fact, the defendant's demeanor throughout the night in question was calm and collected. Moreover, there is nothing about defendant's age (39), intelligence, or education that would indicate lack of capacity to give consent. The defendant's capacity was not in any way diminished by drugs or alcohol. The testimony of the agents as to the questions asked and defendant's response was uncontradicted: the defendant unequivocally stated that he consented to the search.

The defendant was not threatened, physically intimidated, or punished by the police. The defendant did not rely upon promises or misrepresentations made by the police, and did not object while the search occurred. As discussed above, defendant was not in custody when the consent was given and the search conducted. In addition, defendant's companion was present at the time defendant gave his consent to search, and was urging the defendant to cooperate with the agents so that they could leave.

■ While it is true that the defendant was not informed of his right to withhold consent, this factor is not of "controlling significance". *See Watson, supra,* 423 U.S. at 424, 96 S.Ct. at 828. Although consent cannot be coerced by explicit or implicit means, a consent is not rendered involuntary simply because the person who consents is subjected to unpleasant alternatives. *See Schneckloth, supra,* 412 U.S. at 224, 93 S.Ct. at 2046.

The defendant also contends that even if his consent was voluntary, the search exceeded the scope of defendant's consent. Defendant's argument is based on the agents searching all three bags, not advising the defendant of the purpose of their request, and using the word "look" instead of "search".

■ Defendant's argument has no merit. The standard for measuring the scope of a defendant's consent is that of reasonableness: i.e., what a reasonable person would have understood by the exchange of words between the officer and the suspect. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). In this case, it is reasonable to construe the agents' request to look into the bags as a request to look at their entire contents. Moreover, the defendant failed to place any explicit limitations on the search.

■ The fact that the defendant was not informed of the purpose of the search is irrelevant. *See United States v. Snow,* 44 F.3d 133 (2d Cir.1995). Here, the defendant knew that the agents had already discovered $10,000 in United States currency and were probably in search of more. Finally, defendant's distinction between "look" and "search" is equally without merit. *See id.* at 135; *see also United States v. Rich,* 992 F.2d 502 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 348, 126 L.Ed.2d 312 (1993).

Based on the record before the court, and after considering all of the circumstances surrounding the search of defendant's luggage, I find that the government has met its burden of demonstrating that defendant gave an informed, knowledgeable and voluntary consent to the search.

## CONCLUSION

For the reasons set forth above, it is recommended that defendant's motion to sup-

press the evidence obtained as a result of the search of his luggage be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd.,* et al., 838 F.2d 55 (2d Cir.1988). The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(à)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and Report and Recommendation to the attorneys for the parties.

**SO ORDERED.**

DATED: **Buffalo, New York**
**August 9, 1995**